Phyllis WILLIAMS

v.

**HOUSTON LIGHTING & POWER COMPANY, et al.**

**No. CIV. A. G–96–672.**

United States District Court,
S.D. Texas,
Galveston Division.

Oct. 9, 1997.

Thomas M. Stanley, Stanley and Assoc., Houston, TX, for Plaintiff.

L. Chapman Smith, Matthew Paul Eastus, Paul J. Stancil, Baker and Botts, Houston, TX, for Houston Lighting & Power Co.

Jay Darwyn Hirsch, Hirsch, Robinson, et al., Houston, TX, for Plan 21 Inc.

### ORDER

KENT, District Judge.

Plaintiff Phyllis Williams brings claims against her former employer, Houston Lighting & Power Company ("HL&P"), and its independent employee assistance program administrator, Plan 21. Williams alleges that she was discriminated against and wrongfully terminated in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101–12213, and Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e to 2000e–17. Now before the Court are the Motions for Summary Judgment of both Defendants HL&P and Plan 21, dated May 14, 1997 and June 25, 1997, respectively. For the reasons set forth below, both Motions for Summary Judgment are **GRANTED.**

### I.  FACTUAL BACKGROUND

Phyllis Williams worked for HL&P for approximately six years as a network technician responsible for the maintenance of various computer networks at the South Texas Project Electric Generating Station, a nuclear power plant in Matagorda County, Texas.

On June 11, 1995, Williams called her supervisor, Pablo De la Rosa, to tell him that she would not be able to report for work because she was entering a hospital for the treatment of migraine headaches. The following day, Williams checked into the hospital at the request of her physician, Dr. Williams. The exact reason for her hospital stay is unclear, although she claims, that Dr. Williams admitted her into the hospital because he suspected that she had a drug addiction problem. While Williams was away from work, another HL&P employee called her at home to ask where a particular manual was located, and was informed by the babysitter (who happened to be her mother-in-law) that Williams was in "rehab."

Williams did not report for work on June 11 or 12, 1995. She returned to work on June 14, 1995. HL&P requested that she submit a physician's statement, in accordance with company policy. She returned with a statement from a Dr. J.N. Cannon, but with nothing from Dr. Williams. HL&P requested that Plaintiff get a statement from Dr. Williams because the company understood that he was her treating physician. Dr. Williams refused to provide such a statement. Because Plaintiff could not get a physician statement from her treating physician explaining her absence from work and her alleged stint in "rehab," HL&P requested that she sign a "Consent to Participate in the Employee Assistance Program and Authorization for Release of Confidential Information" form. HL&P requested that Williams sign this form to enable them to determine whether she had a substance abuse or dependency problem. Williams was suspended from work when she refused to sign the form. On June 21, Williams returned to work and signed the form, after her attorney recommended that she sign it. Subsequently, HL&P administratively referred Williams to Plan 21, the independent employee assistance and counseling organization retained by HL&P to provide counseling and other services. Pursuant to company policy, such administrative referral is mandatory, and enables HL&P to determine the existence, nature, and extent of an employee's suspected substance abuse.

Plan 21 counselors referred Williams to Dr. Degner, a substance abuse specialist. He in turn recommended that she be admitted to a hospital on a day patient basis for five half-day sessions of group counseling and drug and alcohol abuse education. On July 20, 1995, after she had completed these sessions, she was informed that she was not chemically dependent and could return to work. Dr. Degner did, however, make a diagnosis of "opiod abuse" based on her abuse of prescription painkillers. He informed her that she could take only over-the-counter medication, not her prescription medication, for her headaches. Dr. Degner released Williams to work full time without any work restrictions at all, and she returned to work on July 25.

Dr. Degner also wrote a letter to an employee in HL&P's Human Resources Department to inform them of his diagnosis and that Williams was not to take her prescription medication. On July 27, HL&P held a return to work meeting for Williams where they informed her that Plan 21 directed her not to take her prescription painkillers but that she was not chemically dependent. Based on the diagnosis of opiod abuse, HL&P informed her that she would be subject to an increased monitoring and testing program based on established "fitness for duty" procedures. Also at that meeting, according to an affidavit by Vickie Harris of HL&P's Human Resources Department, Williams denied that her doctors told her not to take her prescription medication. A "fitness for duty" meeting was held on August 3, at which time Williams was again informed that she was not to take her prescription medication. At the August 3 meeting, Williams refused to sign a return to work agreement and again allegedly denied that she had been instructed to refrain from her prescription painkillers. Harris then confirmed Dr. Degner's and Plan 21's orders regarding her prescription medication, prepared a new return-to-work form explicitly referring to those orders, and faxed a copy to Williams on August 9. That same day, Williams's supervisor called her and ordered her to attend another return-to-work meeting on August 10. HL&P terminated Williams's employment after she refused to sign the return-to-work agreement and failed to attend the August 10 meeting.

The return-to-work agreement that HL&P required Williams to sign was an agreement that Williams would abstain from all "mind altering chemicals," agree to follow up alcohol and drug screens, refrain from using addictive prescription painkillers, meet with an Employee Assistance Program counselor monthly for the first year and then quarterly for two additional years, and agree to conditions for failure to comply. According to Harris, Williams refused to sign the form because she was in the midst of a custody battle over her children and "she would lose her job before she would lose her children." Williams alleges that all of these events were precipitated by her husband, who called Dr. Williams, the Human Resources Department at HL&P, and Plan 21 to mislead them into believing that Williams had problems with illegal drugs and alcohol. HL&P alleges that Williams refused to sign the return-to-work agreement because she was afraid that her husband would use it against her in the ensuing custody battle over their children.

Williams timely filed a Notice of Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on May 20, 1996, alleging only violations of the Americans with Disabilities Act. The EEOC issued her a "Right to Sue" letter on August 30, 1996, and Williams brought the present action on December 2, 1996.

## II. LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c). The Court must accept the evidence of the non-moving party and draw all justifiable inferences in favor of that party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87, 106 S.Ct. 1348, 1355–56, 1355–56, 89 L.Ed.2d 538 (1986). Determining credibility, weighing evidence, and drawing reasonable inferences are left to the trier of fact. *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986).

The party moving for summary judgment bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The movant may meet this burden by pointing out to the Court that there is an absence of proof on any essential element of the nonmovant's case. *Id.,* 477 U.S. at 325, 106 S.Ct. at 2554. Once this burden is met, the burden then shifts to the nonmoving party to establish the existence of a genuine issue for trial. *Matsushita,* 475 U.S. at 585–87, 106 S.Ct. at 1355–56; *Wise v. E.I. DuPont de Nemours & Co.,* 58 F.3d 193, 195 (5th Cir.1995). The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts," but instead must come forward with specific facts to show that there is a genuine issue for trial. *Matsushita,* 475 U.S. at 586–87, 106 S.Ct. at 1355–56 (citing FED.R.CIV.P. 56(e)). The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. Only disputes over facts that might affect the outcome of the lawsuit under governing law will preclude the entry of summary judgment. *Anderson,* 477 U.S. at 248–48, 106 S.Ct. at 2510. If the evidence is such that a reasonable fact-finder could find in favor of the nonmoving party, summary judgment should not be granted. *Id.; see also Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356.

### III. ANALYSIS

■ As an initial matter, Defendants both argue that summary judgment is appropriate as to Plaintiff's Title VII claims because she has failed to exhaust her administrative remedies. Plaintiff filed a charge of discrimination with the EEOC on May 13, 1996, checking only the box alleging violations of the ADA. Exhaustion of administrative remedies is a prerequisite to bringing a Title VII action. *National Ass'n of Gov't Employees v. City Pub. Serv. Bd. of San Antonio,* 40 F.3d 698, 711 (5th Cir.1994); *Tolbert v. United States,* 916 F.2d 245, 247–48. Notably, Plaintiff failed to respond to Defendant's argument that her Title VII claim is now time-barred. Accordingly, Defendants' Motions for Summary Judgment are **GRANTED** as to Plaintiff's Title VII claims and those claims are **DISMISSED WITH PREJUDICE.**

■ Plaintiff also brings claims of discrimination and wrongful termination in violation of the ADA. The ADA provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability ... in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To prevail on her ADA claim, Plaintiff must prove 1) that she has a "disability," 2) that she is "qualified" for the job, and 3) that an adverse employment decision was made solely because of her disability. *Turco v. Hoechst Celanese Chem. Group, Inc.,* 101 F.3d 1090, 1092 (5th Cir.1996), *Rios v. Indiana Bayer Corp.,* 965 F.Supp. 919, 921 (S.D.Tex.1997). A "disability" is defined as "a physical or mental impairment that *substantially limits one or more of the major life activities* of such individual," a "record of such an impairment," or "being regarded as having such an impairment." 42 U.S.C. § 12102(2) (emphasis added).

Included in the EEOC's definition of "major life activities" are "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). To be considered substantially limited in one of these activities, an individual must be either (i) unable to perform a major life activity that the average person in the general population can perform, or (ii) significantly restricted as to the condition, manner or duration under which he can perform a particular major life activity as compared to an average person in the general population. 29 C.F.R. § 1630.2(j)(1).

■ Williams contends that she can prove she was ADA disabled because of her

migraine headaches under all three possibilities: either sale had a substantially limiting impairment, she had a record of such an impairment, or HL&P regarded her as having such an impairment. However, the record supports none of these conclusions. The Court finds as a matter of law, for the reasons that follow, that Plaintiff-does not have an impairment that substantially limits any major life activity, and therefore has failed to establish a prima facie case against either defendant under the ADA.[1]

■ First, the evidence clearly shows that Williams did not have an impairment or a record of an impairment that substantially limited any major life activity. On the contrary, the record shows that Williams was perfectly able to work and that the Plan 21 doctor, Dr. Degner, released her to work without any restrictions whatsoever.[2] Indeed, Williams did return to work on July 25 with no accommodation or restrictions until HL&P terminated her employment. Quite candidly, her attorney wrote a letter to HL&P on August 21, 1995 denying that Williams had any problems requiring employment restrictions and demanding that she be returned to her job. The only evidence the Court can find to support Plaintiff's allegation that she was disabled is that she had to take two days off of work when she checked into the hospital on June 12, 1995 pursuant to her doctor's instructions. However, Plaintiff herself contends that this hospital stay was due to her doctor's mistaken perception that she was abusing drugs and alcohol. Furthermore, a temporary occurrence such as this does not constitute a "substantial limitation" as a matter of law.

See Villarreal v. J.E. Merit Constructors, Inc., 895 F.Supp. 149, 152 (S.D.Tex.1995).

In fact, Plaintiff's claim that her migraine headaches constitute a "disability" for ADA purposes, without a shred of evidence that she was thereby restricted in any major life activity, is ridiculous and absurd in light of Fifth Circuit case law establishing that even serious impairments do not necessarily rise to the level of a "disability." See, e.g., Bridges v. City of Bossier, 92 F.3d 329, 334 (5th Cir.1996), cert. denied, —— U.S. ——, 117 S.Ct. 770, 136 L.Ed.2d 715 (1997) (hemophilia that excluded plaintiff from his chosen occupational field of firefighter is not a substantial limitation on the major life activity of working); Rogers v. International Marine Terminals, Inc., 87 F.3d 755, 759 (5th Cir. 1996) (chronic ankle problems including gout, bone spurs, and ligament damage that required plaintiff to miss more than one year of work was not severe or chronic enough to qualify as a disability); Ellison v. Software Spectrum, Inc., 85 F.3d 187, 191 (5th Cir. 1996) (breast cancer requiring chemotherapy and involving significant side effects from treatment did not qualify as a disability); Oswalt v. Sara Lee Corp., 74 F.3d 91, 93 (5th Cir.1996) (high blood pressure not substantially limiting).[3]

■ Second, Williams contends that HL&P regarded her as having an impairment of either chemical dependency or alcoholism. The record shows HL&P was willing to allow Williams to return to work full-time, without any work restrictions, as long as she agreed to a monitoring program for substance abuse. That HL&P did not consider Williams's abuse of prescription medi-

1. Plan 21's Motion for Summary Judgment is nearly identical to, and granted on the same basis as, HL&P's Motion for Summary Judgment. Plan 21 argues additionally that Plaintiff's claims against it are barred because of her "failure to raise them in any way, shape, or form" in her EEOC charge. However, Plaintiff's ADA claims against Plan 21 were indeed raised in a way, shape, and form. A party's right to institute a civil suit encompasses " 'such EEOC investigation as reasonably proceeds' " from the EEOC charge. National Ass'n of Gov't Employees v. City Pub. Serv. Bd. of San Antonio, 40 F.3d 698, 711 (5th Cir.1994) (quoting King v. Seaboard Coast Line R. Co., 538 F.2d 581, 583 (4th Cir. 1976)). Plaintiff submitted a statement with her

EEOC charge detailing her allegations and describing the part played in the events by Janet Zaozirny, Plan 21's representative. Therefore the original EEOC charge encompassed Plan 21 as a defendant, and a civil action against Plan 21 could spring from the EEOC charge.

2. Because Plaintiff has not specified which major life activity her impairment allegedly affected, the Court assumes that she claims that her migraines affected her ability to work.

3. The Court finds it interesting that Plaintiff cites absolutely no authority whatsoever supporting any of her positions in her Response to HL&P's Motion for Summary Judgment.

cation as a substantial limitation on her ability to perform her job is evidenced by its willingness to allow her to return to work without any accommodation or work restrictions. The evidence simply fails to show that HL&P regarded Williams as having any condition that limited her ability to perform her job fully. Plaintiff's allegations that HL&P regarded her as disabled are nothing but mere speculation, and do not support a cause of action under the ADA.

■ Even assuming that Plaintiff's migraine headaches qualify as an ADA disability or that HL&P regarded her as disabled, HL&P has presented a rational, non-discriminatory reason for its insistence that Williams sign the Follow Up Agreement before returning to work. This Court has held such "return-to-work" agreements to be valid requirements for employment. *McKey v. Occidental Chem. Corp.*, 956 F.Supp. 1313, 1319 (S.D.Tex.1997). The company had a compelling reason for requiring Plaintiff's compliance with the monitoring regimen: her doctor had diagnosed her as an abuser of prescription medication. HL&P clearly has a significant obligation to its employees and to the public as a whole to ensure compliance with the health and safety regulations at its nuclear power plant. It is imperative that in the administration of something as complex and dangerous as a nuclear power plant HL&P ensure that its workplace is drug and alcohol-free. Once HL&P has any suspicion, *however* raised, that one of its employees may have a drug problem, prescription or otherwise, it has an affirmative duty to act to prevent the problem from affecting its plant operations. Requiring a known substance abuser to comply with standard monitoring requirements is a reasonable and necessary response to a very serious and pervasive problem.

Plaintiff has failed to meet her burden of proving that HL&P's reasons for terminating her were pretextual. *See Id.* at 1316–17 (once the defendant provides a legitimate, nondiscriminatory reason for the alleged discriminatory action, burden shifts to the plaintiff to show that the proffered reason is a mere pretext and the real reason for the action is based on an impermissible animus).

In fact, Plaintiff presents no reason at all why HL&P would intentionally discriminate against her. Accordingly, the Defendants' Motions for Summary Judgment on Plaintiff's ADA claims are hereby **GRANTED** and those claims are **DISMISSED WITH PREJUDICE.**

The Court perceives that this case is not really about discrimination, but about a person who found herself in a "Catch–22" situation that had no easy escape. In the ambit of savings and loan cases of the early 1990's, this Court frequently heard civil cases involving defendants with dilemmas similar to the one Ms. Williams faced with her employment problems and child custody suit. The defendants in the savings and loan cases found themselves in a lose-lose situation: they could either choose to defend themselves in the civil case and face criminal charges growing out of incriminating discovery, or refuse to comply with discovery requests and face severe discovery sanctions imposed by the Court.

The predicament of those defendants was similar to the crossroads at which Phyllis Williams found herself when HL&P refused to allow her to return to work unless she signed the Follow Up Agreement for substance abuse. She could choose to lose her job, or she could sign the agreement and risk that her husband would use it against her in the child custody suit. Her choice was that she would "lose her job before she would lose her children." Although regrettable, the fact that Williams was faced with such a consequential dilemma does not present a cause of action to this Court. HL&P cannot be expected to adhere to the standard that its nuclear plant employees must consent to the policies of the company regarding drug and alcohol abuse, unless they happen to be going through a divorce and child custody dispute or other situation where their consent could be held against them. If this Court were to allow Plaintiff's claims to go forward, HL&P's drug abuse program would be effectively eviscerated and it would be left defenseless to protect the safety and integrity of its nuclear power plant operations against the mind-altering, body-numbing effects of

drugs and alcohol. This Court will not abide such a result.

Plaintiff was entitled to fight her battles however she chose, but she must now endure the consequences. Termination was the consequence of her choice to refuse compliance with HL&P's perfectly reasonable "Fitness for Work" policies. Williams will have to accept the consequence of her choice; she cannot place the blame of her unfortunate situation on her employer. Accordingly, for the reasons stated above, the Defendants' Motions for Summary Judgment are hereby **GRANTED** and all claims are **DISMISSED WITH PREJUDICE.** All parties are **ORDERED** to bear their own taxable costs and attorney's fees incurred herein to date.[4]

**IT IS SO ORDERED.**

---

**4.** In passing, the Court notes that most of Defendant Plan 21's Motion for Summary Judgment is absolutely, unequivocally identical to HL&P's previously filed Motion for Summary Judgment: word-for-word, cite-for-cite, title-for-title, and emphasis-for-emphasis. Either this is an uncanny coincidence, or Plan 21 is paying for remarkably duplicative services. Considering the astonishing similarity of the two motions, the Court fervently hopes that each client is getting the 2–for–1 special.